AMS ASSOCIATES, INC. v. United States and Laminated Woven Facts Committee, et al., 2012-1688. Mr. Whistler. Okay, may it please the Court, I am Ron Whistler of Kutak Rock  which does business under the name Shapiro Packaging. Shapiro Packaging contests commerce selection of the 91.73% China-wide rate as the adverse facts available margin applicable to respondent, a foodie, in the final results of the first review. Shapiro Packaging does not contest the use of facts available, nor does it contest the use of an adverse reference. Do you mean the use of facts available? Can you just use the statutory language? Yeah, it's adverse facts available. That's not the statutory language. Oh, okay. The facts otherwise available despite the deficiencies that, well, in your submissions. It's facts available and then, well, first the commerce confinement, they should use facts available. And then if they also find an adverse inference, they can use adverse facts available. So we're saying it's okay for the Department of Commerce to have used adverse facts available in this case. Our issue is what was the margin that they should have selected? The Department of Commerce selected the 91.73% China-wide rate as the adverse facts available rate. Now you can see there's no verification that occurs at the preliminary stage, right? So zero verification. Right, we withdrew, a foodie withdrew prior to the scheduled verification. Okay, so but your argument is they should go back to those confidential documents that were withdrawn and at least look at what was left after all the reductions? Right, you submit public versions and proprietary versions. And normally the public versions delete the proprietary information and if there's numerical information, it's usually ranged within plus or minus 10%. So the real argument though is that there's nothing in those public versions that would allow the full verification. No, we understand there was no verification and the fact that we withdrew from the case and prevented verification is reason for the application of facts available and the adverse inference. So we recognize that there's gonna be a punitive rate applied to a foodie. The only question is, is the China-wide rate the proper rate? Because there's a series of cases from the lower court, the Court of International Trade, that says when a company or when the record evidence shows that a respondent operates free from Chinese government control, it should not get the China-wide rate. I'm sorry, but I understood this to be simply that something that I don't think you can test. Tell me if you do. You have the burden to show, or a foodie has the burden to show that it was free of government control. Once you left the proceeding, the evidence remaining in the proceeding did not allow commerce to conclude that you were free of government control, or more precisely, did not allow commerce to conclude that you had met your burden of establishing that because even a bunch of necessary information that remained in the public record couldn't be verified. And once you couldn't meet that burden, there's only one rate to apply, the one that applies country-wide. No, I'm saying that, they're gonna apply an adverse rate. There is a line of cases. I just wanna be clear about this. Everything that I just said said nothing about adverse or anything like that. Do you agree that you have the burden to establish freedom from government control? And if you didn't, the country-wide rate applies? Yes, that is correct. So, and the commerce concluded that once you left the proceeding and took confidential information, both things together, they could not reach a determination on verifiable information that you were free of government control. They did not say that. What commerce said was the department does not have any record evidence upon which to determine whether ZBO or FUTI is eligible for a separate rate for this review period. Thus, as a FUTI has not demonstrated its entitlement to a separate rate. I mean, those two things, it seems to me, together say just what I thought I was reading it to say. No, they say there's no record evidence. I am saying, yes, there is record evidence. There is- Record evidence to do what? For you to meet your burden on verifiable information that you're entitled to a separate rate. No, I don't read it that far. Granted, there was no verification in this review. However, verification is not necessary in every proceeding. Verifications are mandatory in investigations and they are mandatory in administrative reviews every third time. Wasn't it a fact determination by commerce that there was inadequate evidence? No, this is what, we're asking you to look at what commerce actually said. And commerce actually said the department does not have any record evidence upon which to determine. They're saying there was not enough evidence for them to determine. That's not a fact question? That's not a fact determination? I don't, well, they say they did not have any record evidence. I am saying there was record evidence and it was the public information that was in the record. But we owe deference to commerce's fact determination, don't we? But they didn't make, if commerce said, okay, we're looking at the public information and it's not good, and it's not good because of this, this, this, and this. Fine, but what they did say is commerce does not have any record evidence. No, I'm sorry, it didn't stop there. Any record evidence to do what? Upon which to determine whether Zeebo Afudi is eligible for a separate rate for this review period. Right, and I take it to be not explicit, but I would say actually pretty clearly implicit in that, to mean for us to determine on the basis of evidence that we feel comfortable relying on to make that determination. And then they make that factual determination by looking at the evidence. I am saying I want a remand for it to go back and then to look at the public information that remained on the record and then make a determination. They cannot just say there is no record evidence when there is record evidence. When Afudi withdrew from the case, we also asked that you destroy all the proprietary information. And commerce did that. And on October 4th, they issued a letter to us saying, we destroyed the information as you requested. The other parties also destroyed the information. And then they said, but the public record remains, the public information remains on the record. So that is record evidence. And commerce should, you know. Which they couldn't verify, right? They couldn't verify. And that goes, but the inability to verify goes to the application of facts available and adverse and the adverse inference. It does not go to the finding, the factual finding. So they never made a factual. What's left in the public record though that tells us anything? Well, I can tell you. They made a preliminary determination, okay? Based on what we submitted, which included proprietary and public information. But if you look at their actual determination and the preliminary determination, there is no reference to proprietary information. It was, the determination was made in the Federal Register Notice. There was not a separate proprietary memo that they referred to. So all their determination was public. And then the information that they referred to in that determination, which we demonstrated on pages, I think, 12 to 17 in the brief, all of that was public information. There was no proprietary information. But there were no calculations that they did and the things that they referred to. They were not, they made no calculations. Well, to make the preliminary determination, I mean, they had a number, right? A percent. I'm sorry. When they made the preliminary determination, yes, they did do a margin. But they also made a preliminary determination as to whether the company was eligible to the company, to the separate company rate. Right. Because we admit, the margin, you know, we walked away from it. We couldn't support it. But again, the determination as to whether they were eligible for the separate company rate. They made a determination. Based on information that was given. Right. That then ultimately couldn't be verified. I mean, it's. That is correct. But the absence of the verification, our, you know, prevention of them verifying the information, that goes to whether they should, you know, whether facts available should apply and whether we didn't act to the best of our ability. So then you should have the adverse inference. Right? We know, we're gonna get penalized in this case. Okay? When I, you know, when we advise our clients to say if you do not, you know, fully participate and if the information does not work out, you are gonna get adverse facts available and you're gonna get the China-wide rate. Okay? But in this case, there's information in the record that shows they are eligible, even though they're gonna get a penalty rate, they are entitled to a rate other than, other than the China-wide rate. And there is a series of cases in the lower court that state when a company is subject to adverse facts available, if the record shows that they are free from government control, then commerce has to apply adverse facts available. It's gonna be an adverse rate, but it has to be other than the China-wide rate. Because the China-wide rate is. Can I ask this question? Are there cases that say, if you cannot establish freedom from government control, you can nevertheless be entitled over commerce? No, no. Can I finish my question? I'm sorry. That you nevertheless can object to commerce saying that the country-wide rate applies. No, because. That's what we have here, isn't it? No, I don't think so. Because we did not permit verification of it, but the information is still in the administrative record that they operate free from government control. They made that determination in the preliminary result. How do they know it's true? Well, if they think that our response was so totally horrible that nothing could be relied upon in it, including our ASA rate. This is one of the government's arguments that they made, that everything can be disregarded under 1677 M, D, and E. And they could do that. But for them to do that, they have to make a decision. They did not even mention those statutory things in their decision. They did. No, they did not mention 1677 M, D in their decision. They mentioned it in their boilerplate, but they did not mention it in their findings. But they parrot the language of it. They set out 1677 E, then they set out 1677 M at page 30, and then they start their findings on page 31, and they use all the language. It's a boilerplate, but look at the decision. They make three decisions. There's three areas where they actually make a determination. There's one on the first column in 14908, under changes since the preliminary results. It starts at, however, we no longer find Zibo Afudi eligible for separate rate status, and as it has significantly impeded the department's ability to conduct this proceeding, that goes to 1677 E. Right, 1677 E, yeah, which is application of facts available, and then they, you know, and so this thing only goes to why they're applying facts available. The next one, 1409, also in the middle of the first column, you know, they say Zibo withdrew from participation, because of this, the department does not have any record evidence upon which to determine whether Afudi is eligible for the separate rate. That's their determination. They had no evidence whatsoever in the record to make a determination, and our point is that's not true, and then again, over in the next column, they say, you know, we withdrew, and because, you know, we can apply facts available, and we find an adverse inference, so the only place where they make a decision talking about the China-wide rate, why they apply the China-wide rate, is in the one on, in the first column of 14909. Mr. Whistler, you're well into your rebuttal time, but since we asked you a lot of questions, we'll give you three minutes back for rebuttal, and let's see if from the government. Okay, thank you. And is the government splitting its time with the private party? Yes, Your Honor. All right, 12 and three. I'm sorry? 12 and three. 12 and three, Your Honor, thank you. May it please the court. In a non-market economy such as China, the burden is on the respondent to affirmatively demonstrate that it's free from government control and entitled to a separate anti-dumping duty rate. By removing all of its business proprietary information, including core information regarding its ownership, and refusing to participate further in proceedings, I-40 significantly impeded commerce's ability to determine whether it was entitled to a separate rate. Consequently, commerce properly considered I-40 to be part of the China-wide rate, part of the China-wide entity, and subject to the China-wide rate. We believe this decision should be affirmed. So if I understand the challenge, one version of it is this, that you jumped too quickly from the inability to verify information to inability of I-40 to establish separate lack of state control, and that what you needed to have done was take the intermediate steps of saying, here is, of saying what you would effect, what you do, in fact, say in your brief, but doesn't appear in the commerce decision, namely, here are specific items of information without which we could not possibly find I-40 free from Chinese government control. And once we don't have those, it doesn't really matter what else is there, because without those, we couldn't reach the decision. But you don't, but commerce doesn't make specific findings of the sort that you set out in your brief. What's your answer to that? That's correct, Your Honor. What commerce did say, however, was that I-40, what was left once I-40 left the proceeding, took all of its business proprietary information with them, was a serious deficiency. And under statute, commerce is authorized, commerce has discretion to disregard all the remaining evidence and apply whatever facts may be available. And in the case of a separate rate determination, if there's no evidence or evidence can't be relied upon because, amongst other things, it's not verifiable information and the party's not participating, then we just go back to the presumption of entitlement, of being part of the China-wide entity and subject to the China-wide rate. Suppose I did not read 1677-E-A to say that when there's omitted information or you significantly impeded, you can ignore all of that party's evidence, but rather, as I think is actually much more natural under the statutory language, you can rely on the facts still available, the facts otherwise available, otherwise there, meaning not tainted by the omissions or impedances. That would include some of their information. And then B says you can draw adverse inferences in selecting from that, but not simply and absolutely say whatever that party did are wrong, therefore nothing that party has said, including submissions on, you know, notarized forms that you agree are verifiable are to be ignored. What, isn't there still a gap in commerce's reasoning, or rather under that assumption, isn't there a gap that commerce would have to say on this separate control, separate rate, lack of state control question, here are some critical facts we simply cannot verify, including facts still in the record. And commerce doesn't say that. Commerce certainly cannot ignore reliable, verifiable information, but- Including from the party that impeded the investigation. Correct, but in this case, the critical information that was necessary to determine, in particular, the de facto ownership of the company was simply not there. And whatever remained of the record, there was a determination by commerce that IFUTI had significantly impeded the proceedings, and once you have that actual, once you have that determination, under both 1677E and 1677M, commerce is allowed to disregard all of that information. So with respect to the separate rate question, commerce wasn't required to dig in and see what there might be given IFUTI's refusal to cooperate and to participate in the proceedings. And I think the distinction, the trial court cases that Shapiro relies upon here, I think provide that distinction, because in that situation, there was a determination based upon evidence that the particular company was entitled to a separate rate. So that first question was answered. And then the second question was, what's the appropriate rate? And the trade court has said you can't use adverse facts, you can't, with respect to what the particular margin is, if they have proven the first question. But here, we never got to that question, because the first question, are they entitled to a separate rate? They simply didn't meet their burden of proof in that regard. So the presumption goes back to, they're part of the China-wide entity and subject to the China-wide margin. It's not the case that commerce selected the China-wide margin as an AFA rate. Commerce simply said, you're part of the China-wide entity, subject to the China-wide margin. Can I ask you this question? I noticed that this particular proceeding, because it's an administrative review under 1675, comes under a particular standard or review provision that restricts our review to substantial evidence in accordance with law, that doesn't authorize us to determine whether the decision was arbitrary and capricious or kind of had some defect in expression of reasoning, independent of whether there's substantial evidence or a violation of law. Does that fact that we're under a particularly narrow standard of review affect our ability to say, commerce really needed to express some steps that it left out of its opinion? I'm not sure that there's a distinction, Your Honor. I haven't given it a lot of thought, but generally speaking, I think we mentioned this in our brief, if the path that commerce followed is reasonably discernible then the court should feel free to affirm that decision. We think that the steps here, finding that they significantly impeded the proceedings, finding that the application of facts available was appropriate, finding that they were not entitled to a separate rate and then subsequently what the appropriate China-wide rate is, which again, I don't understand the appellants to be challenging. Commerce's reasoning, although maybe perhaps not as explicit as would be good for the court, is still discernible from the record of the proceedings. So we think there's still a basis for the court to affirm. Thank you. As I mentioned earlier, just to mention to the court, as we described on pages 16 and 17 of our brief and as the intervener mentioned on pages 19 and 20, there are critical pieces of information that are missing from the record, particularly with respect to who the individual ultimate owners of the company are. That information was information that commerce needed to reach a determined nation. Is there any information on that public record that would lead to the conclusion that they weren't government controlled? It would lead to the conclusion that they weren't government controlled? I mean, there's some information regarding du jour freedom, but certainly with respect to de facto independence, there's some significant gaps in the record that wouldn't allow commerce to reach that determination. And I think it's also important to point out that, I mean, to the extent that we're, the pellet may be suggesting that commerce could have just simply looked back to the preliminary determination. That preliminary determination is based upon evidence that's no longer in the record. I don't think he's arguing that. He's just saying that there are cases out there that say, yes, you can pick adverse facts available and yes, you can apply an alternative rate, but you don't necessarily jump. To the China-wide rate. Well, and to be clear again, I think it's a two-step question. The question is, are you entitled to a separate rate? If so, what's the appropriate rate? We don't get past the question, the first question, because the first question is, you're not entitled to a separate rate. Therefore, you're entitled to the same margin as the China-wide entity. And if the court has no further questions, I will turn the time over to the Interveners Council. Thank you, Ms. Hogan. And Mr. Denning for Interveners. Good morning, your honors. My name is Jeff Denning. I'm with the law firm of King and Spalding. We represent the petitioners, the Laminated Woven Sacks Committee. The Laminated Woven Sacks Committee were petitioners of the original investigation and the underlying first administrative review and has been actively involved in all proceedings under the Laminated Woven Sacks orders. I'm gonna jump right into a question raised by Judge Toronto, and that is, whether or not there are gaps in the record, whether or not the Department of Commerce failed to walk through a number of steps. We submit that there are not gaps. Rather, we submit that there is a very, very large gap and that the department, therefore, need not have gone through a set of steps. Shapiro's Chinese affiliate, Afudi, chose to withdraw from the proceeding and specifically refused to be verified. At that point, all of the information on the record is unreliable. Not only did Afudi remove from the record the business proprietary information, which therefore obviously cannot be used in the final results, but the public information that remained on the record that respondents are not allowed to remove, but nonetheless remained on the record, is unreliable. The department intended to verify, they were refused the opportunity to verify, so that public information cannot be relied upon for any purpose. So consequently, this is a record that has a monumental gap. There is no information concerning eligibility for a separate raid, because the information that remains on the record is unreliable information. You're saying that that public information that he wanted CIT to send Commerce to look at and wants us to send Commerce to look at, that all of that is tainted by their removal. Absolutely. And in fact, if this court were to agree with Afudi and rule that the Department of Commerce should look at the public information that remained on the record, that the result of that ruling would be that a respondent could come into a proceeding, participate for a while, pull out, refuse to be verified, but yet demand that the Department of Commerce rely on that information. There would be no opportunity to check the accuracy of that information because that's the verification process. Afudi refused to be verified and the information that remained on the record following that refusal is unreliable for any purpose. Afudi cites no case where the department was required to rely upon verified, sorry, required to rely on unverified information. Now, we submit that refusal to verify is the same thing as failing verification. So the public information that's on the record that could not be verified is for all intents and purposes information that was not verified. Afudi failed verification by not allowing there to be a verification. Now, concerning the steps, the department faces uncooperative respondents and applies total adverse effects available on a number of occasions. It oftentimes will walk through holes in the record and say the respondent was uncooperative and we have this difficulty and that difficulty. In this case, there was really no record, there is no record on which the separate rate determination can be made and the department stated that repeatedly in the final results. It said the information it had relied upon previously was unavailable. It stated that on a number of occasions that Afudi had prevented verification. So there was really only one step for the department in this process and that was to say there was no information on the record available for demonstrating eligibility for a separate rate. A different point. Afudi asked the court to send the matter back to consider eligibility and whether or not a different AFA rate should be applied. It doesn't dispute that it is a respondent that merits application of total AFA but it says the 91.73% rate is inappropriate, pick a different rate. There is no different rate. These proceedings, in these proceedings, Congress has only calculated two margins. Afudi's 64.28% margin in the original investigation, a totally cooperative rate and the AFA rate utilized in the original investigation as the China-wide rate which was corroborated by reference to Afudi's margin calculations in the original investigation. So there are only two margins, the 91.73% rate and a cooperative 64% rate which is Afudi's rate. Now, I know of no case where the department has been required to apply a totally cooperative rate to a respondent and a subsequent proceeding in which it is now a totally AFA company. That means that- I don't think he's arguing a totally cooperative rate, he's arguing something in the middle. I agree. And my point there is that the 64% rate is unavailable. He's not arguing for it, he shouldn't, it would never be applied. So what is left? The 91.73% total AFA China-wide rate. There is no other rate out there to be applied. Now, Judge Musgrave below noted the fact that Afudi has argued for application of a different rate but it didn't identify any different rates. It didn't identify any different rates because there really aren't any other rates. So even where this managed to be sent back as it should not and a determination made that Afudi is eligible for a separate rate, which it is not, there still is no other rate, there is no alternative. 91.73 is the China-wide rate and it's the AFA rate and that would be what they would be assigned as a total AFA company eligible for a separate rate. Thank you, Mr. Denning. Mr. Whistler has a little rebuttal time, three minutes. As to the question of the existence of another rate, the Department of Commerce is very creative in determining other rates. I can even come up with a rate. But you haven't. I mean, now I thought that was. No, it's not my job to do it, but I can tell you. Can you let me finish? You didn't propose anything, Judge Musgrave was right. You didn't propose anything below. It was tellingly absent from your briefs up here. You're not proposing that there is an alternative available. Well, obviously that is the Department of Commerce job to come up with one. I could say, if you're gonna ask me, but no one's gonna take what I say, but you could take an average of the 91 and the 64 and that is, you know, because Mr. Denning is right, you're not gonna use a 64% rate because that was cooperative. But if you take an average of that rate and the 91, you would come up with something in the middle, which is higher and would thus be punitive. Commerce. Well, you'd be the first person to argue that if Commerce picked a rate without any evidence to base it upon, that that would work. Well, they have to corroborate it and then they will go through their corroboration exercise. They, believe me, they come up with rates that you would never believe. They come up with, they can come up with something when they need to, all right? So Commerce can come up with a rate and they can corroborate it. How do you respond to Mr. Denning's comment that you're asking them to use your public information to come up with that rate and yet all of that public information is unreliable? No, no. The rates that we're asking, no one is going to use the information that we provided in the first review, the numbers, as a margin. Those are out. What the Department of Commerce can do is select a rate, and basically they have the 91.73 rate, which is their default rate, which can be used, will be used in most circumstances. However, in the unique circumstances of this case, where we say we have provided sufficient evidence to show we operate free from government control, you cannot use that rate because the line of cases, you know, King Dow, Gerber, you know, the ones we went through in our brief, you cannot use, you cannot apply the China-wide rate to a company that establishes that it is free from government control because the China-wide rate presumes government control. So if a company shows that it is not under government control, you cannot apply the China-wide rate, even if you need to apply adverse facts available. If you look at the six or seven cases that the lower court has applied this rule, it's similar to these cases. These are cases, these are not cases where somebody has refused to participate at all. These are cases where people have been participating, they were anticipating good margins, but some terrible disaster happened, either after verification, they failed verification. In our case, it was before the verification took place and we pulled out. But we participated, we submitted. As you may have noted, your red light has been on for a while. Oh, okay. So we'll take the case under advisement. Okay, thank you.